## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| K.B., a minor, by his parent and next friend, | : | | |
| SYLVIA BROWN, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 13-0649 (RC) |
| | : | | |
| v. | : | Re Document Nos.: | 18, 20 |
| | : | | |
| DISTRICT OF COLUMBIA, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT & DENYING PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiff K.B. is a young man with a learning disability who received special education and related services pursuant the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 *et seq.* ("IDEA"). K.B. began attending the Monroe School in the District of Columbia as a ninth grade student in November 2010. In May 2012, the District of Columbia Public Schools ("the District" or "DCPS") determined that K.B. should transfer to High Road Academy for the 2012-2013 school year so that he could receive appropriate instruction from dually certified teachers. K.B.'s mother, Ms. Sylvia Brown, filed a due process complaint alleging that the District violated the IDEA and denied K.B. a free and appropriate public education ("FAPE") by unilaterally changing his placement to High Road, a school that she believed would be unable to implement K.B.'s individualized educational program ("IEP"). After a due process hearing, the hearing officer determined: (1) that the move from Monroe to High Road did not constitute a change in educational placement, and (2) that High Road could appropriately implement K.B.'s

IEP, so DCPS did not deny K.B. a FAPE.  K.B., through his mother, argues that the hearing

officer erred by ignoring controlling law and relevant facts and that DCPS should be ordered to

pay K.B.'s outstanding tuition at Monroe.  Now before the Court are the parties' cross-motions

for summary judgment.  As explained below, because Ms. Brown failed to show that the hearing

officer erred, the Court will grant the District's motion for summary judgment and will deny

Plaintiff's cross-motion for summary judgment.

## II.  BACKGROUND

### A.  Statutory Framework

Congress enacted the IDEA "to ensure that all children with disabilities have available to

them a free appropriate public education that emphasizes special education and related services

designed to meet their unique needs and prepare them for further education, employment, and

independent living."  *Henry v. District of Columbia*, 750 F. Supp. 2d 94, 96 (D.D.C. 2010)

(quoting 20 U.S.C. § 1400(d)(1)(A)).  "A free appropriate public education entitles 'each child

with a disability' to an 'individualized education program' that is tailored to meet his or her

unique needs."  *Id.* (quoting 20 U.S.C. §§ 1414(d)(1)(A)-(2)(A)).

The individualized education program ("IEP") is the "primary vehicle" for implementing

the IDEA.  *Lesesne ex rel. B.F. v. District of Columbia*, 447 F.3d 828, 830 (D.C. Cir. 2006)

(citation omitted).  The IEP is "[p]repared at meetings between a representative of the local

school district, the child's teacher, the parents or guardians, and, whenever appropriate, the

disabled child."  *Id.* (citation omitted).  It "sets out the child's present educational performance,

establishes annual and short-term objectives for improvements in that performance, and

describes the specially designed instruction and services that will enable the child to meet those

objectives."  *Id.* (citations omitted).

When the parents of a student with a disability are dissatisfied with a school district or agency's "identification, evaluation, or educational placement of the child, or the provision of a free appropriate public education to such child," 20 U.S.C. § 1415(b)(6), the IDEA entitles them to present their arguments at an "impartial due process hearing." *See id.* § 1415(f).  During the pendency of such proceedings "unless the State or local educational agency and the parents otherwise agree, the child shall remain in the then-current educational placement of the child." *Id.* § 1415(j).  This so-called stay-put provision of the IDEA was intended to prevent school officials from excluding disabled children from regular public schools over parental objection during the course of review proceedings. *See Honig v. Doe*, 484 U.S. 305, 327 (1988).

### B.  K.B.'s Education

K.B. is a student with a disability classification of Specific Learning Disability.  Pl.'s Statement of Material Facts ("Pl.'s SOF") ¶ 5, ECF No. 19-3.  He also struggles with anxiety. *Id.* ¶ 7; A.R. 314–17, ECF No. 6–8.  According to Ms. Brown, K.B. has changed schools on a number of occasions since beginning his education, and his anxiety went largely unaddressed by schools that did not have the time to talk to him about his concerns.  A.R. 285, 341.

In November 2010, K.B. began attending ninth grade at the Monroe School, a nonpublic day school for students with learning disabilities.  Pl.'s SOF ¶ 12.  K.B. initially had some difficulties with the transition, which his mother attributes to the fact that K.B. had just transferred from an "overbearing" school environment.  A.R. 309.  When he arrived at Monroe, K.B. had a "limited tolerance for frustration and a less than average ability to persevere in the face of obstacles," and he was "at risk for recurrent episodes of overt anxiety, tension, nervousness, and irritability."  Pl.'s SOF ¶ 10 (quoting A.R. 6).  As K.B.'s anxiety rose, he would begin to sweat, which in turn further increased his anxiety as he worried about the odor.

A.R. 389–90.  He required almost daily counseling in response to critical incidents and

emotional trauma, and he had problems concentrating on assignments at school.  A.R. 388–89.

On several occasions, K.B. shut down, putting his head on his desk in class and saying he could

not do the work.  A.R. 403.  In addition, he did not interact with the other students or participate

in school activities when he first arrived at Monroe.  A.R. 413.

 With time and counseling, however, K.B.'s behavior stabilized and his emotional issues

decreased.  A.R. 388–89.  He learned to manage his glandular condition and developed increased

self-esteem.  A.R. 390.  His academic performance improved to the extent that K.B. began to

approach or even exceed grade equivalency in some subjects, and he no longer required daily

counseling.  A.R. 390, 399.  In the view of Dr. Carolyn Gravely-Moss, Monroe's counseling

psychologist, K.B. made significant progress at Monroe and has learned to be his own self-

advocate.  A.R. 405.

 In January 2012, when K.B. was in the tenth grade, DCPS notified K.B. that they

intended to transfer him from Monroe to a computer-based program located within Spingarn, a

general education high school.  Pl.'s SOF ¶ 15.  K.B.'s mother filed a due process complaint to

challenge the transfer, and she ultimately prevailed.  *Id.* ¶¶ 16–17.  On April 16, 2012, the

hearing officer found that K.B.'s IEP called for direct instruction throughout the day, and that

because he would lose that direct instruction if transferred from Monroe to what was primarily a

computer-based program, the "decision to change the Student's location of services was actually

a change in placement."  A.R. 73–74.  The hearing officer also found that the computer-based

program was designed for students with emotional disturbances, which K.B.—who had been

bullied in the past and was socially vulnerable—did not have.  A.R. 74.  The hearing officer

concluded that the change in placement constituted a denial of a FAPE, and he ordered DCPS to

fund K.B.'s attendance at Monroe for the remainder of the 2011-2012 school year and to

convene an IEP meeting within 20 school days from the issuance of the decision.  A.R. 74–75.

K.B.'s IEP meeting was subsequently held on May 21, 2012, for the purpose of reviewing his

IEP and discussing the school that K.B. would attend for the 2012-2013 school year.  A.R. 101–

02.

At the May 21 hearing, the IEP team—including Ms. Brown—reviewed K.B.'s progress

on his IEP goals, his social and emotional functioning, and his strengths and weaknesses.  *Id.*

Dr. Gavely-Moss, explained that K.B.'s weaknesses included emotional instability, a lack of

trust, anxiety, and anxiety-related perspiration problems.  A.R. 105–06.  She further explained

that despite some initial regression in response to instability in his living situation, K.B. was

getting to the point where he should be in terms of his social and emotional development.  A.R.

106.  After some discussion, the IEP team agreed upon the quantity and nature of K.B.'s

instruction and support services; he was to receive 25.5 hours of specialized instruction, 60

minutes of speech-language pathology services, and 60 minutes of behavioral support services

each week.[1]  A.R. at 103, 106, 301, 451–52.  The IEP team also agreed that all of K.B.'s

specialized instruction and support services were to be delivered outside of the general education

setting.  A.R. at 90.

The IEP team then considered the school that K.B. would attend for the upcoming school

year.  The DCPS compliance case manager stated that DCPS planned to change the location of

K.B.'s services to High Road.  A.R. 103.  She explained that DCPS had determined that Monroe

---

[1] Although both parties agreed at the May 21, 2012, IEP meeting that K.B.'s behavioral support services should be increased from 30 to 60 minutes each week, and that his specialized instruction time should be increased from 25 to 25.5 hours weekly, those changes are not reflected in the May 21, 2012, IEP.  *Cf.* A.R. 90 *with* A.R. 103, 301, 451–52.

could not implement K.B.'s IEP because it lacked teachers that were dually certified in special education and a content area. A.R. 103, 107. High Road, in contrast, had dually certified teachers and could implement K.B.'s IEP. A.R. 107. K.B.'s mother disagreed with the proposed transfer, saying that K.B. had already changed schools too many times in the past and that change made K.B. anxious. A.R. 103, 107.

At the conclusion of the meeting, the DCPS progress monitor issued a prior written notice indicating the proposed change in location of services from Monroe to High Road for the 2012-2013 school year. A.R. 80. The notice explained that Monroe could not implement K.B.'s IEP and provide the necessary specialized instruction as the school lacked certified special education teachers. A.R. 80.

## C. The 2013 Due Process Hearing

K.G.'s mother initiated the present action when she filed a due process complaint on December 3, 2012,[2] seeking to prevent the transfer of K.B. to High Road. A.R. 130–47. As is relevant here, K.B.'s mother alleged that on May 21, 2012, DCPS denied K.B. a FAPE by changing his 2012-2013 placement from Monroe to High Road, which could not meet K.B.'s needs.[3] A.R. 137–41.

---

[2] Ms. Brown first filed a due process complaint on an unspecified date "over the summer in 2012," but because she could not take off work to attend a due process hearing at the time, she asked that the complaint be dismissed without prejudice and re-filed in December 2012. Statement of Blaeuer at ¶¶ 3–5, Pl.'s Ex. A, ECF No. 20-4.

[3] The due process complaint included a number of other allegations that were withdrawn at the beginning of the due process hearing on January 15, 2013. *See* A.R. 4, 5 n.5. Additionally, the complaint alleged that DCPS denied K.B.'s mother her right to participate in the decisionmaking process by unilaterally predetermining K.B.'s 2012-2013 placement. A.R. 5. The hearing officer found that DCPS had satisfied the IDEA's requirements for parental input in the May 21, 2012 meeting and that K.B.'s mother failed to prove that she had been denied an opportunity to participate. A.R. 21. Ms. Brown has not appealed this finding.

The ensuing due process hearing occurred on January 15 and January 28, 2013.  A.R. 4.
The hearing officer heard testimony from five witnesses and admitted into evidence a total of
twenty-two exhibits.  A.R. 4 n.3–4.  First, Ms. Brown testified that she liked how K.B. was
treated at Monroe, that she did not want him moved to High Road, and that she was not
concerned about the lack of dually-certified teachers at Monroe.  *See* A.R. at 285–315.  K.B. then
explained that he had made progress at Monroe, that he wanted to go away to college to study
animation, media, moviemaking, and drawing, and that while he knew that transferring was
going to help him implement his IEP and achieve his goals, he did not want to change schools.
A.R. at 368–71.

Dr. Gravely-Moss testified at length about K.B.'s social-emotional progress at Monroe,
saying that although K.B. initially "was suffering from a lot of emotional trauma from the school
where he was" before Monroe, he had "pretty much stabilized . . . until we started having these
multitudes of hearings over and over again" about the school K.B. would attend.  A.R. 388–90.
She stated that transferring K.B. was inappropriate because he would "have to reorganize and
reorientate [sic] himself to another area," which she believed would be emotionally harmful.
A.R. 393–94.  She explained that she did not think that K.B. could get the access to the "kind of
intense counseling" from properly trained counselors that he would need "at a regular school,"
and that his self-esteem would decrease at another school if the children teased him about his
glandular issues.  A.R. 401–02.  Dr. Gravely-Moss also noted that it had taken her six months or
so to establish a therapeutic relationship with K.B., and that she believed it would take some time
for him to build that relationship with someone else.  A.R. 408–10.  Although Dr. Gravely-Moss
initially concluded that K.B. would "suffer" if removed from Monroe and all the services he
received there, she subsequently admitted that she did not know precisely how K.B. would adjust

to a new school, explaining that she "can't speak for what would happen at another school . . . because [she doesn't] know where he's going." A.R. 418–19.

The hearing officer also heard testimony from the directors of Monroe and High Road, who provided detailed information about their respective schools. The director and CEO of Monroe, Ruth Logan-Staton, explained that Monroe is a full-time placement providing academic and related services on campus, serving "students predominately with specific learning disabilities." A.R. 324. She testified that the student-teacher ratio was 5:1 or 6:1, and that Monroe provided SAT support, college tours, and community service opportunities for its students. A.R. 325–26. She also explained that as of the IEP meeting in May 2012, none of K.B.'s teachers were dually certified in D.C., but K.B.'s history teacher had a special education certificate from the District. A.R. 328–30, 337–58. By the time of the due process hearing, that history teacher and K.B.'s English teacher were both dually certified by the District in special education and a content area, but his business management, geometry, and science teachers were still working towards obtaining their D.C. certificates.[4] *Id.*

Finally, High Road director Tina Stith-Twine provided the hearing officer with information about High Road, explaining that the school serves students with learning disabilities, that it has a student-teacher ratio of 2:1 to 4:1, that it partners with a community-service organization to help students earn their service hours, and that it is a full-time "therapeutic day school" providing speech and behavioral support services on site. A.R. 444–

---

[4] K.B.'s business management teacher was taking classes to be certified in health and physical education, and was teaching with a transitional certificate. A.R. 350–52. K.B.'s geometry teacher was certified to teach special education in Maryland through grade eight, and was seeking reciprocity to teach special education in D.C. through grade twelve and seeking to obtain a certificate to teach math. A.R. 353–54, 362. K.B.'s science teacher was certified in D.C. as a substitute teacher, and was seeking to obtain a reciprocity certificate in special education. A.R. 355.

45, 452–55.  For those students interested in attending college, High Road offers the ability to earn a high school diploma, a career assessment with a transition coordinator, a class introducing students to college life and the skills needed to succeed there, an annual college fair on campus, college tours, a three-day event where students stay with and shadow a college student at Trinity University, SAT fee waivers, and assistance with completing federal financial aid forms and applying for scholarships.  A.R. 460–63.  Ms. Smith-Twine also explained that classes at High Road are taught by a teaching assistant and two teachers, including one content-certified and one special-education certified teacher.  A.R. 453–54.  As for services to facilitate K.B.'s transition to High Road, Ms. Smith-Twine explained that K.B. would be assigned to a licensed social worker and would work with the school's transition coordinator, that the school would conduct a 30-day review with all concerned parties to ensure that K.B.'s program is working well for him, that K.B. would receive individual counseling and could attend an all-male group session, and that he would always have the ability to speak with someone during the school day if issues arose, even if it was not during his pre-designated counseling time.  A.R. 447–57, 65-67.

On February 5, 2013, the hearing officer issued a written determination explaining his finding that K.B.'s mother had failed to prove that DCPS denied K.B. a FAPE or that it had changed his educational placement for the 2012-2013 school year.  A.R. 15.  As an initial matter, the hearing officer determined that no change in educational placement had occurred because the transfer from Monroe to High Road affected only the location of K.B.'s educational services and not the nature or quantity of services that K.B. would receive.  A.R. 17.  The hearing officer considered the qualities of both schools before concluding that they were "substantially identical," possessing "small classes, low student-teacher ratios, therapeutic supports, and a focus on preparing students for post-secondary education."  A.R. 17.

Additionally, the hearing officer determined that High Road would be able to implement K.B.'s IEP "as well, or more effectively," than Monroe, so the change in location of services did not constitute a denial of a FAPE. A.R. 17. While acknowledging as legitimate the concern that K.B. may have difficulty adjusting to a new school environment and that he may experience anxiety as a result of the change, the hearing officer ultimately determined that K.B.'s anxiety and difficulty in transitioning to new environments actually pointed in favor of the transfer because the benefits of higher quality instruction combined with the benefits of High Road's college preparation program would likely be critical to K.B.'s success in pursuing his goal of obtaining a post-secondary education. *See* A.R. 17–21.

### D.  Ms. Brown's Appeal

Ms. Brown appealed the Hearing Officer Determination ("HOD") by filing a complaint in this Court on May 6, 2013, asserting that the hearing officer erred and that DCPS did deny K.B. a FAPE by unilaterally changing his placement from Monroe to High Road. *See generally* Compl., ECF No. 1. Specifically, she contends that the hearing officer erred by: (1) finding that there was no change in K.B.'s educational placement, and (2) ignoring the harmful effects of transferring on K.B. *Id.* at ¶¶ 25–38. Ms. Brown's complaint requested a declaration that K.B. was denied a FAPE and an injunction ordering DCPS to fund K.B.'s placement at Monroe for the remainder of the 2012-2013 school year and for the 2013-2014 school year. *Id.* at 6.

By the time that Ms. Brown filed her motion for summary judgment in October 2013, however, the 2012-2013 school year had already ended, and she sought only declaratory relief and "an injunction ordering DCPS to fund K.B.'s placement at The Monroe School for the remainder of the 2013-2014 school year." Pl.'s Mot. Summ J. at 1, ECF No. 7. More time passed as the parties completed briefing on their respective motions for summary judgment, and

while the matter was under advisement, K.B. graduated from Monroe with a high school

diploma.  *See* Notice in Resp. to Ct.'s Minute Order at 1, ECF No. 15; Pl.'s Notice to the Ct. at 1,

ECF No. 16.  K.B. went on to take classes at a community college in Maryland, and has been

accepted by a four-year college in Delaware that he plans to attend.  Pl.'s Notice at 1.

Additionally, while this matter was pending, the Monroe School "filed an administrative

complaint in the D.C. Office of Administrative Hearings regarding the District's non-payment of

tuition for K.B., and several other students."  Pl.'s Notice at 2.  Monroe reached an agreement

with the District for K.B.'s tuition for the 2012-2013 school year, but "[n]o agreement has been

reached for K.B.'s tuition at Monroe for the 2013-2014 school year, and K.B.'s tuition remains

outstanding."  Pl.'s Notice at 2.

### E.  Supplemental Briefing

On September 25, 2014, this Court denied without prejudice both parties' motions for

summary judgment and ordered additional briefing on the potential impact of intervening events

on the Court's subject-matter jurisdiction.  Mem. & Order at 2–4, Sept. 25, 2014, ECF No. 17.

The Court also ordered supplemental briefing on the issue of standing.  Order, May 22, 2015,

ECF No. 25.  Now before the Court are DCPS's motion for summary judgment or, in the

alternative, for judgment on the pleadings, Def.'s Mot. Summ. J., ECF No. 18, and Ms. Brown's

cross-motion for summary judgment seeking declaratory relief and an order requiring DCPS to

pay for K.B.'s senior year at Monroe, Pl.'s Cross-Mot. Summ. J., ECF No. 20.

### III.  STANDARD OF REVIEW

Following an administrative proceeding under the IDEA, any party that is "aggrieved by

the findings and decision" of the hearing officer may bring a civil action in federal court.  20

U.S.C. § 1415(i)(2).  The reviewing court "(i) shall receive the records of the administrative

proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C); *see also* 34 C.F.R. § 300.516(c).

In a civil action challenging a hearing officer determination under the IDEA, "[a] motion for summary judgment operates as a motion for judgment based on the evidence comprising the record and any additional evidence the Court may receive." *D.R. ex rel. Robinson v. District of Columbia*, 637 F. Supp. 2d 11, 16 (D.D.C. 2009). Where neither party submits additional evidence for the court's review, "the motion for summary judgment is simply the procedural vehicle for asking the judge to decide the case on the basis of the administrative record." *Heather S. v. Wisconsin*, 125 F.3d 1045, 1052 (7th Cir. 1997) (internal quotation marks omitted); *accord Savoy v. District of Columbia*, 844 F. Supp. 2d 23, 30 (D.D.C. 2012).

When evaluating a hearing officer's decision under the IDEA, the court reviews the administrative record and bases its decision on the preponderance of the evidence. 20 U.S.C. § 1415(i)(2)(C)(iii). The hearing officer's decision is afforded "less deference than is conventional in administrative proceedings." *Reid v. District of Columbia*, 401 F.3d 516, 521 (D.C. Cir. 2005) (internal quotation marks omitted). "Yet while a court must engage in a more rigorous review of the decision below than is typical in administrative cases, it should nevertheless accord the hearing officer's decision due weight, and should not substitute its own view of sound educational policy for that of the hearing officer." *G.G. ex rel. Gersten v. District of Columbia*, 924 F. Supp. 2d 273, 278 (D.D.C. 2013) (internal quotation marks omitted). The burden of proof is with the party challenging the administrative determination, who must "at least take on the burden of persuading the [C]ourt that the hearing officer was wrong." *Reid*, 401 F.3d at 521 (internal quotation marks omitted).

## IV.  ANALYSIS

### A.  Jurisdiction

Article III of the Constitution limits the power of federal courts to actual "Cases" and

"Controversies."  U.S. CONST. art. III, § 2.  From this requirement courts have derived several

doctrines—including standing and mootness—to ensure that courts do not stray beyond the

limits of their constitutionally allotted authority.  *Warth v. Seldin*, 422 U.S. 490, 498 (1975)

(noting that the several doctrines that elaborate upon Article III's case and controversy

requirement are "founded in concern about the proper—and properly limited—role of the courts

in a democratic society.").

To meet the constitutional requirement of standing, a plaintiff must show that: (1) she has

suffered an injury which is (a) concrete and particularized and (b) actual or imminent, not

conjectural or hypothetical; (2) there is a causal connection between the alleged injury and

conduct that is fairly traceable to the defendant; and (3) it is likely, as opposed to merely

speculative, that the injury will be redressed by a favorable decision.  *Lujan v. Defenders of*

*Wildlife*, 504 U.S. 555, 560–61 (1992).  Courts assess standing by measuring the facts as they

existed at the time the suit commenced.  *Del Monte Fresh Produce Co. v. United States*, 570

F.3d 316, 324 (D.C. Cir. 2009).

But even if standing once existed, courts must take additional pains to ensure that

jurisdiction continues to exist throughout all stages of the litigation.  *Davis v. FEC*, 554 U.S. 724,

732–33 (2008) ("To qualify as a case fit for federal-court adjudication, an actual controversy

must be extant at all stages of review, not merely at the time the complaint is filed." (internal

quotation marks omitted)). Thus, later events may render a once-viable claim moot.  *Becker v.*

*FEC*, 230 F.3d 381, 387 n. 3 (1st Cir. 2000) ("[W]hile it is true that a plaintiff must have a

personal interest at stake throughout the litigation of a case, such interest is to be assessed under the rubric of standing at the commencement of the case, and under the rubric of mootness thereafter."); *see Advanced Mgmt. Tech., Inc. v. FAA*, 211 F.3d 633, 636 (D.C. Cir. 2000) (noting that "[s]tanding is assessed at the time the action commences," whereas mootness concerns whether "a justiciable controversy existed but no longer remains").

Before considering the merits of Ms. Brown's claims, this Court must first address the threshold question of whether it has jurisdiction to hear them. DCPS argues that this matter is moot in light of K.B.'s graduation from Monroe with a high school diploma in 2014 without paying tuition. Def.'s Mot. Summ. J. at 10, ECF No. 18. Ms. Brown argues that because she explicitly requested that DCPS fund K.B.'s placement at Monroe, and because DCPS still has not paid for the 2013-2014 school year, effectual relief remains available and the case is not moot. Pl.'s Cross-Mot. Summ. J. at 11–17. DCPS, however, believes that because Ms. Brown has not shown that she is subject to an enforceable contractual obligation to pay tuition for the 2013-2014 school year, she lacks an injury-in-fact that would be redressable by an order of this Court awarding tuition reimbursement. *See generally* Def.'s Suppl. Opp'n, ECF No. 27. The Court considers each argument in turn, beginning with the question of mootness.

A case is moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future." *District of Columbia v. Doe*, 611 F.3d 888, 894 (D.C. Cir. 2010) (internal quotation marks omitted)). During the course of this litigation, DCPS funded K.B.'s 2012-2013 school year, K.B. attended Monroe for his junior and senior years, and he graduated with a high school diploma in 2014. Accordingly, Ms. Brown has abandoned her now-moot requests for funding for K.B.'s

junior year as well as her request for a court-ordered placement at Monroe.[5]  *See* Pl.'s Cross-

Mot. Summ. J. at 1 (limiting request for injunctive relief to an order requiring payment of K.B.'s

unpaid 2013-2014 tuition).  She maintains that this matter is not moot, however, because this

Court can still order effectual relief by requiring DCPS to pay the still-outstanding tuition for

K.B.'s senior year at Monroe.

A number of courts have found that a student's high school graduation—or a similar

intervening event rendering the student ineligible for IDEA benefits—can moot a claim for

declaratory and injunctive relief under the IDEA if the plaintiff has not requested relief in the

form of tuition reimbursement or compensatory education.[6]  Compensatory education consists of

"education services designed to make up for past deficiencies in a child's program." *Boose v.*

*District of Columbia*, 786 F.3d 1054, 1056 (D.C. Cir. 2015).  Tuition reimbursement, on the

other hand, requires DCPS "to belatedly pay expenses that it should have paid all along." *Sch.*

*Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 370-71 (1985).

---

[5] An exception to the mootness doctrine exists where "(1) the challenged action is in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that *the same complaining party* will be subject to the same action again." *Doe*, 611 F.3d at 894.  Under District of Columbia law, DCPS is not obligated "to provide FAPE to children with disabilities who have graduated from high school with a regular high school diploma."  D.C. Mun. Regs. Subt. 5–E, § 3002.2(c).  Thus, because K.B. is no longer eligible for IDEA benefits from DCPS, this matter does not fall under the "capable of repetition, yet evading review" exception to the mootness doctrine.

[6] *See, e.g.*, *Moseley v. Bd. of Educ. of Albuquerque Pub. Schs.*, 483 F.3d 689, 692–94 (10th Cir. 2007) (dismissing as moot plaintiff's requests for declaration of an IDEA violation, prospective injunctive relief, attorney's fees and costs and any other appropriate relief where student had graduated and never requested compensatory damages); *Brown v. Bartholomew Consol. Sch. Corp.*, 442 F.3d 588, 596–600 (7th Cir. 2006) (finding that appellant's claim for declaratory and prospective injunctive relief under the IDEA, unaccompanied by a request for damages, became moot when student moved to a different school district); *Thomas R.W. v. Mass. Dep't of Educ.*, 130 F.3d 477, 479–81 (1st Cir. 1997) (finding that appellant's claim for declaratory and injunctive relief under the IDEA, unaccompanied by a request for damages, became moot when appellant graduated).

Here, as DCPS correctly points out, the phrases "tuition reimbursement" and "compensatory education" appear nowhere in the complaint.  Ms. Brown does not dispute the appropriateness of K.B.'s IEP or the education and related services he actually received at Monroe, and no request for compensatory education can be inferred from her complaint.  The complaint does request, however, that DCPS be ordered to fund K.B.'s education at Monroe. Compl. at 1.  And while DCPS initially asserted that "[t]he Monroe School is involved in separate administrative proceedings against Defendant . . . seeking payment of tuition for K.B.," Def.'s Mot. Summ. J. at 10–11, a verified statement from Ms. Logan-Staton states that "[p]ayment of K.B.'s tuition for the 2013-2014 school year remains outstanding, and no administrative litigation for such payment has been or will be brought," Statement of Logan-Staton at ¶¶ 6–7, ECF No. 19-6.  DCPS now concedes that no such administrative litigation pertaining to K.B.'s tuition for the 2013-2014 school year occurred.  Def.'s Suppl. Mem. at 4, ECF No. 27.

DCPS admits that it has not funded or agreed to fund K.B.'s final year of tuition at Monroe, and that no other administrative litigation is pending to pursue such funding.  Ms. Brown's complaint does clearly request that the Court order DCPS "to fund K.B. at . . . Monroe . . . for the 2013/14 school year."  Compl. at 1.  It thus appears that while the requests for declaratory relief, a placement at Monroe, and funding for the 2012-2013 school year have become moot in light of intervening events, effectual relief remains available in the form of an order requiring DCPS to fund K.B.'s final year of tuition at Monroe.  *See Lesesne*, 447 F.3d at 832–33 (holding that where DCPS had provided plaintiff with some relief but her request for compensatory education remained unaddressed, the matter was not moot); *see also* 20 U.S.C. § 1415(i)(2)(C) (providing courts with discretion to "grant such relief as the court determines is

appropriate"). The case is therefore not moot. *See Chafin v. Chafin*, 133 S. Ct. 1017, 1023

(2013) ("[A] case becomes moot only when it is impossible for a court to grant any effectual

relief whatever to the prevailing party." (internal quotation marks omitted)); *Knox v. Serv.*

*Employees Int'l Union, Local 1000*, 132 S. Ct. 2277, 2287 (2012) ("As long as the parties have a

concrete interest, however small, in the outcome of the litigation, the case is not moot." (internal

quotation marks omitted)).

     This brings the Court to DCPS's second jurisdictional argument: that Ms. Brown lacks

standing to pursue reimbursement for K.B.'s unpaid tuition because "Ms. Brown is under no

obligation to pay Monroe any tuition monies for the relevant school year."[7] Def.'s Suppl. Mem.

at 5. DCPS contends that the oral agreement between Ms. Logan-Staton and Ms. Brown

regarding K.B.'s unpaid tuition for 2013-2014 "amounts to nothing more than an unenforceable,

illusory promise," premised on the understanding that Ms. Brown could not pay the tuition in

question. *Id.* at 5–6. By way of support, DCPS cites *Davis v. Joseph J. Magnolia, Inc.*, which

explains that "a contract lacks consideration when one party's promise is illusory, and a promise

is illusory when performance of that promise is optional." 640 F. Supp. 2d 38, 45–46 (D.D.C.

2009) (holding that where arbitration agreement included language saying that one party had sole

discretion to "periodically change" the terms of that agreement, that language made the party's

performance optional and rendered the agreement unenforceable).

---

[7] DCPS also argues that Ms. Brown lacks standing because she has failed to establish that DCPS was obligated to pay K.B.'s tuition or that a change in educational placement occurred. Def.'s Suppl. Mem. at 4–5. But such arguments conflate considerations of standing with the merits of Ms. Brown's claims and thus have no place in this Court's standing analysis. *See Muir v. Navy Fed. Credit Union*, 529 F.3d 1100, 1105 (D.C. Cir. 2008) ("In reviewing the standing question, the court must be careful not to decide the questions on the merits for or against the plaintiff, and must therefore assume that on the merits the plaintiffs would be successful in their claims." (internal quotation marks omitted)).

"Under D.C. law, as is generally true, for an enforceable contract to exist, there must be both (1) agreement as to all material terms; and (2) intention of the parties to be bound.  Absent any contrary requirement under a statute of frauds, parties may enter into enforceable oral contracts, as long as they agree to all material terms and intend to be bound by their oral agreement."  *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995) (internal quotation marks and citations omitted).  In this case, Ms. Brown has provided the verified statement of Ms. Logan-Staton in support of her assertion that she is contractually obligated to Monroe for K.B.'s tuition for the 2013-2014 school year.  Ms. Logan-Staton recalled that "[w]hen DCPS refused to pay K.B.'s tuition for the 2013/14 school year, in order to allow K.B. to remain at Monroe and graduate . . . Ms. Brown and I (on behalf of the Monroe School) agreed that Ms. Brown would be liable for K.B.'s tuition for that year . . . [and that she would] continue to pursue this litigation to obtain funding from DCPS to K.B."  Second Statement Logan-Staton ¶ 5, ECF No. 26-1.

DCPS highlights Ms. Logan-Staton's subsequent statement that she and Ms. Brown "did not formalize this agreement into a writing" and that Ms. Logan-Staton did not believe that Ms. Brown had or "would have the capacity to pay K.B.'s tuition."   2d Statement Logan-Staton at ¶ 6.  But as Ms. Brown points out, DCPS cites nothing to suggest that a party who contracts to assume a debt without possessing the ability to repay it is not still contractually obligated to pay that debt.  *Cf. E.M. v. N.Y.C. Dept. of Educ.*, 758 F.3d 442, 457–63 (2d Cir. 2014) (holding that IDEA plaintiff established standing to pursue unpaid tuition where she showed that she was contractually obligated to pay school tuition, or was at least was subject to the risk of "potential civil liability should she fail to pay" it).  Unlike *Davis*, the alleged agreement between Ms. Brown and Monroe does not appear to include any language rendering Ms. Brown's performance

optional.  Moreover, in exchange for K.B.'s ability to attend Monroe, Ms. Brown claims to have offered two forms of consideration: the assumption of liability for the tuition and the promise to pursue this litigation to obtain funding from DCPS.  Second Statement Logan-Staton ¶ 5.  DCPS does not appear to dispute that the promise to pursue funding via litigation is valid consideration. *See Eastbanc, Inc. v. Georgetown Park Associates II, L.P.*, 940 A.2d 996, 1003 (D.C. 2008) ("For a contract to be enforceable, each party must undertake to do something [the] party otherwise is under no legal obligation to do . . . ." (internal quotation marks omitted)).

In the absence of any other challenges to the enforceability of the oral agreement, the Court finds that Ms. Brown has established injury-in-fact in the form of her contractual obligations to Monroe, that such injury is traceable to DCPS's failure to fund K.B.'s placement at Monroe, and that is redressable by a court order requiring DCPS to pay the outstanding tuition, thereby relieving Ms. Brown of her contractual obligations.[8]  With standing thus established, the Court turns now to the merits of Ms. Brown's claims.

### B.  The Transfer to High Road Did Not Constitute a Change in "Educational Placement"

Ms. Brown first argues that the hearing officer erred by determining that the transfer to High Road did not constitute a change in K.B.'s educational placement and was instead a change in location of services.  Pl.'s Cross-Mot. Summ. J. at 17.  She contends that at no point does the IDEA define "educational placement" as merely a student's IEP, and she points out that some portions of the IDEA and its implementing regulations use the word "placement"

---

[8] Because the Court finds that Ms. Brown has established injury-in-fact on the basis of her contractual obligation to Monroe for K.B.'s tuition, it need not address her alternative basis for standing premised on the denial of a statutory right to a FAPE.  *See* Pl.'s Suppl. Br. at 5, ECF No. 26.

interchangeably with the word "setting."[9]  *Id.* at 17–18.  Because the stay-put provision of the

IDEA required DCPS to maintain K.B.'s educational placement during the course of these

proceedings, and because DCPS violated that provision by changing K.B.'s educational

placement to High Road, Ms. Brown contends that the Court should award her tuition

reimbursement for K.B.'s senior year at Monroe.  Pl.'s Reply at 5, ECF No. 24.

DCPS disputes Ms. Brown's assertion that "placement means placement," arguing that

"educational placement" is a term of art that this Circuit has defined to mean "at a minimum, a

fundamental change in, or elimination of a basic element of the education program."  *Lunceford*

*v. D.C. Bd. of Educ.*, 745 F.2d 1577, 1582 (D.C. Cir. 1984) (holding that change in location of

residential services and in quality of feeding program "can be a problem, and the subject of a

complaint . . . [b]ut it is not alone sufficient to constitute a change in educational placement" that

would trigger the stay-put provision).  In this case, DCPS argues that the hearing officer

correctly determined that the transfer to High Road did not constitute a change in educational

placement because K.B. was to receive the same services in the same type of educational setting

at a virtually identical school.  Def.'s Opp'n at 8–10, ECF No. 22.

Although the IDEA does not define the term "educational placement," and Ms. Brown's

statutory interpretation argument has some appeal, this Court is not writing on a blank slate.  In

*Lunceford*, the D.C. Circuit Court expressly considered the question of "what constitutes a

child's 'educational placement,'" and, following the lead of the Second Circuit in *Concerned*

---

[9] *See* 34 C.F.R. § 300.530(b)(1) ("School personnel . . . may remove a child . . . from his or her current placement to an appropriate interim alternative educational setting, another setting, or suspension"); 34 C.F.R. § 300.533 ("Placement during appeals: When an appeal under § 300.532 has been made by either the parent or the LEA, the child must remain in the interim alternative educational setting pending the decision of the hearing officer."); 34 C.F.R. § 300.646 (requires data collection regarding "placement in particular educational settings"); 34 C.F.R. § 300.116(b) (requiring that a "child's placement . . . [i]s as close as possible to the child's home").

*Parents v. New York City Board of Education*, 629 F.2d 751 (2d Cir. 1980),[10] it held that not all

changes in location or quality of services qualify as a change in educational placement that

triggers the stay-put provision.  745 F.2d at 1582 (rejecting "an interpretation of change in

'educational placement' that would include all changes" in location of services, because such an

interpretation "would certainly discourage the District from temporarily changing a child's

[residential placement] to improve his education").[11]  In that case, a student who had been

admitted to one residential placement was to be moved to another residential placement.  *Id.* at

1579, 1582.  The child's surrogate-parent protested the change, arguing that although the child

would still receive one-on-one feeding from a nutritionist-developed program at the new

location, the program would not be administered as well because the staff at the new location

were overworked.  *Id.* at 1587.  Though sympathetic to the parent's concerns, the *Lunceford*

court was clear in finding that the change in location of residential services and differences in

administration of the feeding program were "not alone sufficient to constitute a change in

educational placement."  *Id.* at 1581–83.

---

[10] *Concerned Parents* held that although a contested transfer between schools was "poorly planned," and "the move was disconcerting to many of the handicapped children . . . the transfer of handicapped children in special classes at one school to substantially similar classes at other schools within the same school district [does not] constitute[] a change in 'placement' sufficient to trigger the Act's prior notice and hearing requirements." *Id.* at 753–55 (explaining that a decision "to transfer the special education classes at one regular school to other regular schools in the same district" did not constitute a change in educational placement, while "a decision to transfer a handicapped child from a special class in a regular school to a special school would involve the sort of fundamental alteration in the child's education requiring prior parental notification").

[11] As to the relationship between residential and educational services for disabled children, the *Lunceford* court explained that free residential care could be required as part of a free education, and that "the educational needs of a severely handicapped child . . . are closely intertwined with the need for other residential services." *Id.* at 1581–83.

Undaunted, Ms. Brown posits first that *Lunceford* is no longer good law, and second, that even if it controls, she has met her burden of establishing a "fundamental change" in K.B.'s educational program.  Pl.'s Cross-Mot. Summ. J. at 19–25.  As to *Lunceford*, Ms. Brown contends that the decision was abrogated in 1985 by the Supreme Court's decision in *Burlington School Comm. v. Mass. Dept. of Edu.*, 471 U.S. 359 (1985).  *Burlington*, she argues, and a number of subsequently decided D.C. Circuit opinions, all use the term "placement" when referring to a specific school, thereby implicitly overturning *Lunceford*'s "fundamental change" test.  Pl.'s Cross-Mot. Summ. J. at 19–22.

Setting aside the fact that Ms. Brown explicitly invoked the *Lunceford* test in her administrative due process complaint with no suggestion of abrogation,[12] there are two problems with Ms. Brown's argument.  First, the *Burlington* decision can hardly be viewed as abrogating *Lunceford* because the Supreme Court in *Burlington* had no occasion to analyze the meaning of "educational placement" or what constitutes a change therein.  In fact, *Burlington* expressly declined to decide the child's "then current educational placement," deeming the question "academic" in that case and assuming without deciding that the parent had changed his child's educational placement when he rejected the proposed IEP, which "called for placing [the child] in a highly structured class of six children with special academic and social needs, located at another Town public school," and instead enrolled the child at a private school with "a highly specialized setting for children with learning handicaps."  471 U.S. at 363, 371.

---

[12] Indeed, Ms. Brown quoted *Lunceford* for the proposition that "[i]n order to qualify as a change in educational placement, a fundamental change in, or elimination of a basic element of the educational program must be identified."  A.R. 141 (citing 745 F.2d 1577).  She also argued explicitly that "[e]ducational placement under IDEA [is] not simply the physical location of the student, but rather is the provision of special education and related services rather than a specific place."  A.R. 138.  DCPS has not raised these potential inconsistencies, however, and the Court thus does not address them further.

Second, Ms. Brown's assertion that this Circuit abandoned the *Lunceford* definition of "educational placement" post-*Burlington* is incorrect.  Ms. Brown would have the Court infer that this Circuit has rejected *Lunceford* and adopted a "plain-language understanding of placement" in the wake of *Burlington*, pointing to opinions that use the words "place" or "placement" when discussing a child's assignment to a particular school.[13]  Pl.'s Cross-Mot. Summ. J. at 19–21.  However, Ms. Brown's position is flatly contradicted by this Circuit's express application of *Lunceford*'s "educational placement" test well after *Burlington* was decided.[14]  In *Abney by Kantor v. District of Columbia*, 849 F.2d 1491 (D.C. Cir. 1988), decided

---

[13] In one such case, *McKenzie v. Smith*, the Circuit Court cited *Burlington* and *Lunceford* without any suggestion of abrogation, and held that where a parent protested a change in placement from a private special education school to a large public high school where, contrary to the student's IEP, he would receive at least a quarter of his instruction in a regular education setting, DCPS violated the Act's stay put requirement by failing to maintain the student in the same or a similar program during the course of review proceedings.  771 F.2d 1527 (D.C. Cir. 1985).  The decision was thus entirely consistent with *Lunceford*'s holding that a fundamental change in a student's educational program—like the change from private special education program to a public regular education program in contravention of the student's IEP—will constitute a change in educational placement and trigger the IDEA's stay put provision.

[14] A number of other circuits have also continued to distinguish between changes in a student's educational placement and mere changes in the location in which a student receives educational services.  *See, e.g., T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 171 (2d Cir. 2014) ("[T]he term 'educational placement' refers only to the general type of educational program in which the child is placed. That is, the pendency provision does not guarantee a disabled child the right to remain in the exact same school with the exact same service providers while his administrative and judicial proceedings are pending. Instead, it guarantees only the same general level and type of services that the disabled child was receiving." (internal quotation marks and citations omitted)); *AW ex rel. Wilson v. Fairfax Cnty. Sch. Bd.*, 372 F.3d 674, 682 (4th Cir. 2004) ("[T]he touchstone of the term 'educational placement' is not the location to which the student is assigned but rather the environment in which educational services are provided. To the extent that a new setting replicates the educational program contemplated by the student's original assignment and is consistent with the principles of 'mainstreaming' and affording access to a FAPE, the goal of protecting the student's 'educational placement' served by the 'stay-put' provision appears to be met."); *White ex rel. White v. Ascension Parish Sch. Bd.*, 343 F.3d 373, 379 (5th Cir. 2003) ("'Educational placement,' as used in the IDEA, means educational program—not the particular institution where that program is implemented." (internal quotation marks omitted)).

three years after *Burlington*, the Circuit Court cited the *Lunceford* rule and found that a plaintiff

had failed to show an unlawful change in educational placement because "[a]lthough the

instruction he received at Forest Haven was not precisely identical to that which he had been

given at HSC, [the plaintiff] made no showing that it differed fundamentally." *Id.* at 1498 n.6.

In the following year, the Circuit Court again quoted *Lunceford*, noting that although DCPS had

"inexplicably" failed to argue the point, it appeared that a transfer between schools that were

dissimilar only in that one was public and one was private would not constitute a change in

educational placement or trigger the stay-put provision. *See Knight by Knight v. District of

Columbia*, 877 F.2d 1025, 1028–29 (D.C. Cir. 1989). Judges in this district have thus continued

to apply *Lunceford* when analyzing purported changes in educational placements through the

present day.[15]

Having disposed of Ms. Brown's argument that *Lunceford*'s educational placement

definition was abrogated by *Burlington*, the Court now turns to the question of whether Ms.

Brown has established error in the hearing officer's finding that the move from Monroe to High

Road constituted only a change in location of services and not a "fundamental change" in K.B.'s

educational program. The hearing officer found, and Ms. Brown does not dispute, that the move

---

[15] S*ee, e.g., G.B. v. District of Columbia*, 78 F. Supp. 3d 109, 116 (D.D.C. Jan. 14, 2015) (applying *Lunceford* and finding change in educational placement where DCPS proposed reducing hours of instruction and related services, moving child from fully separate setting to one exposing her to non-disabled students, and segregating her from her peers during lunch); *D.K. ex rel. Klein v. District of Columbia*, 962 F. Supp. 2d 227, 233 (D.D.C. 2013) (applying *Lunceford* and finding no change in educational placement despite transfer to a new school because both schools could implement student's IEP and both "offer small classes outside the general setting with individual instruction, strategies for dealing with noise, access to special services, and programs for advanced instruction"); *Aikens v. District of Columbia*, 950 F. Supp. 2d 186, 192 (D.D.C. 2013) (same); *Spilsbury v. District of Columbia*, 307 F. Supp. 2d 22, 27 (D.D.C. 2004) (applying *Lunceford* and holding that elimination of academic tutoring and mental health services constituted a fundamental change in basic elements of the student's educational program, thereby triggering the stay-put provision).

from Monroe to High Road would not affect the quantity or type of education and related services that K.B. received.  A.R. 17.  Likewise, she does not take issue with the findings that at High Road, K.B. "would continue to spend his entire day outside the general education setting in a nonpublic, special education day school," that students in both schools "have similar disability classifications," and that "[t]he two schools are substantially identical, with small classes, low student-teacher ratios, therapeutic supports, and a focus on preparing students for post-secondary education."  A.R. 17.

Although the schools and services provided are effectively identical, Ms. Brown insists that the transfer from Monroe to High Road constitutes a fundamental change to a basic element of K.B.'s educational program because K.B.'s anxiety would have prevented him from accessing his education at a new school.  Pl.'s Reply at 8–9.  She emphasizes that the hearing officer found credible Dr. Gravely-Moss's testimony "about how [K.B.'s] anxiety about starting over at a new school would prevent him from accessing the curriculum," A.R. 14, and she argues that such a finding is irreconcilable with the hearing officer's conclusion that the transfer was not a change in educational placement.  A careful review of both Dr. Gravely-Moss's testimony and the full HOD, however, reveals that the hearing officer's conclusion is sound.

Dr. Gravely-Moss did initially testify that she believed that changing schools would be emotionally harmful for K.B. and that it would impact his ability to access his education, A.R. 394, but she subsequently explained that she was concerned that "at a regular school," K.B. would not have access to the kind of intensive counseling that he would need if children started bullying or teasing him, A.R. 401–02, because "the average school does not have . . . these capabilities," A.R. 410.  She also stated that while she believed that being removed from the services provided at Monroe would harm K.B., she could not speak to how long K.B. might need

to adjust to another school without knowing the school in question, A.R. 418–19, and she suggested that K.B. might feel comfortable at a new school if it had people appropriately trained and qualified to deal with K.B.'s behavior that were willing to counsel him as provided in his IEP and on a crisis basis, A.R. 425–27. It thus appears from Dr. Gravely-Moss's full testimony that the nature and quality of counseling services provided at a new school would affect the duration and severity of any anxiety-related difficulties that K.B. might have.

The hearing officer's decision makes clear that she took these facts into account. *See* A.R. 16 (explaining that in determining whether a change in educational placement occurred, the hearing officer performed a "fact specific" inquiry into whether the proposed change would materially alter K.B.'s educational program or "affect in some significant way the child's learning experience"). The hearing officer credited Dr. Gravely-Moss's testimony and recognized that K.B. would "initially have difficulty transitioning," but she also found that K.B. had learned strategies at Monroe "to help smooth his transition," that he would receive similar therapeutic support at High Road, and that "social workers will be available to assist [K.B.] whenever he experiences anxiety or difficulty coping in his new environment." A.R. 18. Far from ignoring the fact that K.B.'s anxiety could impact his access to his education at a new school, the hearing officer carefully considered the issue and determined that in light of the behavioral and therapeutic services offered, High Road could adequately address any anxiety that K.B. experienced. Accordingly, the hearing officer found that High Road could implement K.B.'s IEP "as well, or more effectively," than Monroe, given the legitimate concerns about the quality of instruction K.B. received at Monroe.[16] A.R. 17–18. The hearing officer therefore

---

[16] As to the quality of instruction at Monroe, the hearing officer found—and the record shows—that none of K.B.'s five teachers were dually certified in D.C. in special education and a content area as of the May 2012 IEP meeting, and that only two of the five were dually certified

concluded that the move to High Road to ensure that K.B was taught by appropriately certified teachers was not the type of fundamental change in an educational program that qualified as a change in educational placement.  A.R. 17.

Affording due weight to the hearing officer's judgment, the Court can discern no error in her conclusion that no fundamental change in K.B.'s educational program—and thus no change in K.B.'s educational placement—occurred.[17]  *See District of Columbia v. Doe*, 611 F.3d 888, 897 (D.C. Cir. 2010) (citing *Dale M. ex rel. Alice M. v. Bd. of Educ.*, 237 F.3d 813, 815 (7th Cir. 2001), for the proposition that if a "district court relies solely on administrative record, [the] IDEA hearing officer's decision warrants due deference").  High Road and Monroe were virtually identical private schools that offered K.B. the same educational and related services in the same type of educational setting.  High Road also offered K.B. instruction from appropriately certified teachers, and like Monroe, it made counselors available at all times to ease any anxiety K.B. would have felt at the transition.  As the hearing officer reasonably concluded, this type of transfer constitutes only a change in location of services.  Thus, the Court finds that because Ms. Brown has not shown that the hearing officer erred in concluding that no change in educational

---

as of the due process hearing.  A.R. 10–11.  The hearing officer was particularly concerned that K.B. was being taught science by an individual who "qualified only as a substitute teacher." A.R. 18 n.150.

[17] *Cf. Gore v. District of Columbia*, 67 F. Supp. 3d 147, 153 (D.D.C. 2014) (finding that transfer from Monroe to High Road constituted a change in location of services and not a change in educational placement); *Ward v. District of Columbia*, No. 13-CV-0098, 2014 WL 272413, at *6-7 (D.D.C. Jan. 24, 2014) (finding no error in determination that change in schools was only change in location of services where new school provided same educational setting, could implement student's IEP, and could provide additional services if needed); *James v. District of Columbia*, 949 F. Supp. 2d 134, 138 (D.D.C. 2013) (holding that hearing officer correctly found educational settings at two schools to be "substantially and materially similar," as both provided "full-time out of general education program," were equipped to address the child's needs, and offered all IEP-required services, such that the transfer was not a change in educational placement).

placement occurred, she has not shown an entitlement to tuition reimbursement premised on

DCPS's violation of the stay-put provision of the IDEA.  *See Lunceford*, 745 F.2d at 1582–23

(holding that where child would receive the same services at a different location, concern about

inferior administration of those services at the new location was not enough "to constitute a

change in educational placement" that would trigger the stay-put requirement).

### C.  High Road was an Appropriate Location of Services for K.B.

Ms. Brown's final argument is that the hearing officer erred in finding that the transfer to

High Road did not result in the denial of a FAPE because she ignored facts and law showing that

High Road was an inappropriate school for K.B.  Pl.'s Cross-Mot. Summ. J. at 22–25.  Ms.

Brown reiterates that K.B.'s anxiety made it inappropriate to move him from Monroe, and she

adds that it was particularly inappropriate to move him "so close to his graduation."  *Id.* at 22–

23.  Ms. Brown further argues that the hearing officer erred by ignoring *Holmes v. District of

Columbia*, 680 F. Supp. 40 (D.D.C. 1998), which held that it was inappropriate to place a child at

a new school in the final semester before his graduation from high school.  *Id.* at 24.  As

explained below, the Court finds none of these arguments meritorious.

"Under the IDEA, an appropriate location of services is one which can implement a

student's IEP and meet his specialized educational and behavioral needs."  *James v. District of

Columbia*, 949 F. Supp. 2d 134, 139 (D.D.C. 2013).  The question of whether a given placement

is appropriate is fact-specific, and takes into consideration a number of factors like "the nature

and severity of the student's disability, the student's specialized educational needs, the link

between those needs and the services offered by the private school, the placement's cost, and the

extent to which the placement represents the least restrictive educational environment."

*Branham v. District of Columbia*, 427 F.3d 7, 12 (D.C. Cir. 2005) (internal quotation marks

omitted).  Although the IDEA entitles a student to an appropriate placement, it does not require

that a state provide a student with the program or location of services of his choice.  *See Bd. of*

*Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 203 (1982) (holding that

state meets its obligations under the Act "by providing personalized instruction with sufficient

support services to permit the child to benefit educationally from that instruction"); *Cooper v.*

*District of Columbia*, No. CV 14-00102, 2014 WL 7411862, at *4-5 (D.D.C. Dec. 30, 2014)

(holding that where DCPS provided an appropriate placement, "it cannot be required to pay for

the education plaintiff would prefer").  The IDEA mandates only "a basic floor of opportunity,"

and district courts are not free to impose a potential-maximizing standard by deeming a

placement inappropriate simply because another location might be better for the child in some

way.  *Kerkam v. McKenzie*, 862 F.2d 884, 889 (D.C. Cir. 1988) (explaining that where a student

was making progress at one school and might not make "the same gains" at a second school, the

second school was not inappropriate simply because it was inferior, so long as it provided "some

educational benefit" for the child).

     In this case, the HOD shows that the hearing officer carefully considered the applicable

law and the evidence before her, and that she reasonably determined that High Road was an

appropriate placement for K.B. that could implement his IEP and confer vital educational

benefits.  A.R. 17–18.  First, as discussed above, the hearing officer considered K.B.'s anxiety

and the possibility that a transfer may, at least initially, result in some impairment of his access

to his education.  *See* A.R. 17–18.  In light of High Road's provision of social workers to assist

K.B. with any anxiety during the transition, however, and upon consideration of the evidence

that K.B.'s teachers at Monroe were not properly certified, the hearing officer concluded that

"the harm [K.B.] will suffer from having to start over in a new environment will be outweighed

by the higher quality of instruction he is likely to receive there."  A.R. 17–18 (explaining that

High Road could implement K.B.'s IEP, and that his anxiety, difficulty with transitions, and

college goals made High Road's higher-quality instruction and "college preparatory courses and

activities" vitally important for K.B. because they would be "critical to his success in his post-

secondary education").  Ms. Brown's assertion that the hearing officer failed to consider harm to

K.B. caused by his anxiety in new environments is thus incorrect.

Second, while Ms. Brown argues that the hearing officer erred by ignoring *Holmes* and

the potential harm to K.B. caused by a mid-year transfer, the hearing officer explicitly

acknowledged that "avoiding . . . mid-year transfers is a desirable goal," and she cited *Holmes*

and *Block v. District of Columbia*, 748 F. Supp. 891 (D.D.C. 1990), for the proposition that

"while a school may be appropriate for a student if he begins the school year there, it is not

necessarily appropriate to inject the student into that school part-way through the school year."

A.R. 18.

In *Holmes*, this Court explained that to transfer a student from an established school that

constituted an appropriate placement to a start-up school that could not "have come even close to

meeting the needs of the [child]," when the child had only a semester left in his high school

education, would be clearly inappropriate.  680 F. Supp. at 42.  The Court went on to add that the

transfer school "would have been an inappropriate placement at all relevant times in the past,"

and that DCPS "had only themselves to blame" for the expense and the delays in the case, which

were attributable to DCPS's failure to prepare a timely IEP for the student and other procedural

mistakes.  *Id.* at 43–44.  Similarly, in *Block*, the Court found that the need for a mid-year transfer

was solely attributable to DCPS's delays, and that given "the special circumstances of [the

child's] condition and DCPS's failure to timely produce a complete and appropriate IEP," the

hearing officer did not err in holding that a mid-year transfer to a public school was not an appropriate placement for the child.  748 F. Supp. at 895–96, 896 n.6 (noting also that DCPS was pursuing the transfer based on a reluctance "to spend money on placements at private schools" and not to "fill any educational need" of the child).

In this case, however, DCPS made the decision to reassign K.B. to High Road in May 2012, "four months before the start of the 2012-2013 school year," and more than two years before his projected graduation date.  *See* A.R. 19, 99.  The fact that K.B. was facing a mid-year transfer by the time the due process hearing occurred was thus a product not of DCPS's decision to change the location of services, but of Ms. Brown's filing of the operative due process complaint seven months after that decision.[18]  A.R. 19; *cf. Holmes*, 748 F. Supp. at 42–44 (finding that DCPS was responsible for the delayed transfer); *Block*, 748 F. Supp. at 895–98 (same).  And while *Block* dealt with a transfer motivated by DCPS's desire to avoid paying for a private placement rather than by the unique educational needs of the child, 748 F. Supp. at 895–96, n.6, here, DCPS "was justified in changing the Student's location of services" due to "legitimate concerns about the quality of instruction the Student received" at Monroe, A.R. 17.

Moreover, while the *Holmes* court was confronted by a mid-year transfer to an unestablished school incapable of meeting the student's needs, 680 F. Supp. at 42, in this instance, the hearing officer heard credible testimony that High Road was fully capable of implementing K.B.'s IEP and providing him with all necessary services, A.R. 17–18.  Ms. Stith-Twine testified not only that High Road could implement K.B.'s IEP, but also that it could accommodate K.B.'s mid-year transfer, explaining that the school routinely managed the anxiety

---

[18] Ms. Brown had filed another complaint earlier in 2012, but she asked that it be dismissed because she could not take time off of work to attend a due process hearing. Statement of Blaeuer at ¶¶ 3–5, Pl.'s Ex. A, ECF No. 20-4.

of students who transferred mid-year, and that to facilitate the move, it would match K.B.'s

current curriculum, have him meet with the school's transition coordinator, and have him work

with a licensed social worker to help him deal with any anxiety or stress.  A.R. 465–67.  The

record therefore supports the hearing officer's finding that High Road could provide educational

benefit to K.B. and implement his IEP even if he was transferred mid-year.  *See Ward*, 2014 WL

272413, at *8 (finding that potential setback to student caused by period of adjustment to a new

school did not make transfer inappropriate where school could provide services to mitigate the

negative effects of the transfer and could implement student's IEP); *see also Paolella ex rel.*

*Paolella v. District of Columbia*, 210 F. App'x 1, 2 (D.C. Cir. 2006) (holding that placement was

not inappropriate where student was assigned to a school that "was conducting a special

education program with trained staff in specifically allocated facilities and that the parents were

assured that their concerns—for example, about the child's transition to the public school—could

be addressed in several ways").

Although Ms. Brown may disagree with the hearing officer's judgment that High Road

could effectively implement K.B.'s IEP, address his anxiety with the transfer, and provide him

with academic benefits that outweighed any harms caused by the move, she has failed to

establish that the hearing officer's decision ignored either binding authority or evidence of harm

to K.B.[19]  In the absence of such a showing, this Court has no reason to second-guess the

---

[19] In her reply brief, Ms. Brown also argues that the hearing officer's assumption that
K.B. would receive better instruction at High Road was erroneous because "almost all of his
teachers at Monroe were certified."  Pl.'s Reply at 6.  While "it is a well-settled prudential
doctrine that courts generally will not entertain new arguments first raised in a reply brief,"
*Lewis v. District of Columbia*, 791 F. Supp. 2d 136, 139 n.4 (D.D.C. 2011), the argument would
fare no better if considered on the merits.  The HOD clearly and accurately described the
evidence in the administrative record, which showed that at the time of the due process hearing,
only two of K.B.'s five instructors had dual certifications from D.C. in special education and a

judgment of the hearing officer that High Road was an appropriate placement for K.B.  *Cf. Kerkam*, 862 F.2d at 888–89 (holding that although expert testified that child has made progress at current placement and would "regress, at least initially, if his placement were changed," where the hearing officer found that new school was nevertheless appropriate to meet child's needs, the district court's unexplained decision to credit the views of those who disagreed with the hearing officer was erroneous); *see also Rowley*, 458 U.S. at 206 ("[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review").

Because DCPS made available to K.B. a free appropriate education at High Road, it "cannot be required to pay for the education plaintiff would prefer."  *Cooper*, 77 F. Supp. 3d at 32.  Parents who choose to place their child in a private school without the agreement of the school district "do so at their own financial risk," and are entitled to reimbursement only if a court concludes both that the placement approved by the school officials violates the IDEA and that the parent's private school placement is proper.  *Florence County Sch. Dist. v. Carter*, 510 U.S. 7, 15 (1993).  Thus, because Ms. Brown has failed to show error in the hearing officer's finding that DCPS provided K.B. a FAPE at High Road, she has not established entitlement to tuition reimbursement for K.B.'s 2013-2014 school year at Monroe.

---

content area, one had an out-of-state license to teach special education to younger students, one had a transitional certificate, and one was certified as a substitute teacher.  A.R. 10–11.

**V.  CONCLUSION**

For the foregoing reasons, the Court grants DCPS's motion for summary judgment and denies Ms. Brown's cross-motion for summary judgment.  An Order consistent with this Memorandum Opinion is separately and contemporaneously issued.

Dated:  September 4, 2015                                RUDOLPH CONTRERAS
                                                        United States District Judge